## IN THE UNITED STATES DISTRICT COURT
### FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| JEREMY MATTWAOSHSHE of the Sovereign Kickapoo Indian Nation and JUSTIN STALLBAUMER of Corning, Kansas, and on behalf of a PUTATIVE CLASS similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NEXTERA ENERGY, INC.  and NEXTERA ENERGY RESOURCES LLC of 700 Universe Blvd, Jupiter, Florida 33408 and all of its wholly and substantially owned subsidiaries incorporated in Delaware and with the same "Mailing Address" with directions as listed: SOLDIER CREEK WIND, LLC to "Attn Corp Gov", NEXTERA ENERGY CONSTRUCTORS LLC and NEXTERA ENERGY TRASMISSION SOUTHWEST LLC to "CORPORATE GOVERNANCE LAW/JB", NEXTERA ENERGY MARKETING LLC and NEXTERA ENERGY OPERATING SERVICES LLC and NEXTERA ENERGY PROJECT MANAGEMENT LLC to "Corporate Governance", and JANE DOE NEXTERA SUBSIDIARIES 1-5, WESTAR ENERGY of Kansas c/o Parent Corp Evergy Kansas Central, Inc. at 2900 SW Wanamaker Suite 204, Topeka, KS 66614 <br><br> and <br><br> the UNITED STATES OF AMERICA (hereinafter the "Government"), Service of Process c/o U.S. Attorney for the District of Columbia 555 Fourth Street, NW, Washington D.C. 20530 and Certified Copy to: U.S. Department of Justice, Attorney General, 950 Pennsylvania Avenue, NW Washington, DC 20530, U.S. DEPARTMENT OF TRANSPORTATION ("DOT") with SECRETARY ELAINE CHAO in official capacity, and FEDERAL AVIATION ADMINISTRATION (hereinafter "FAA") with ADMINISTRATOR STEVE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No._____ <br><br><br><br> INJUNCTIVE RELIEF AND CLASS ACTION COMPLAINT |

| | |
|---|---|
| DICKSON in official capacity 1200 New Jersey Ave, SE, Washington, DC 20590, the FEDERAL ENERGY REGULATORY COMMISSION (hereinafter "FERC") 888 First Street NE, Washington, DC 20426, DEPARTMENT OF ARMY with RYAN MCCARTHY Secretary in official capacity 101 Army Pentagon, Washington DC 20310, and the DEPARTMENT OF JUSTICE ATTORNEY GENERAL WILLIAM BAR in his official capacity, and all other subordinate departments, agencies, offices, and entities of the Government herein implicated, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

.

## CLASS ACTION COMPLAINT[1]

1.      Plaintiffs Justin Staullbaumer and Jeremy Mattwaoshshe, who is also a citizen of the federally-recognized Sovereign Native American Kickapoo Nation, are citizens of the State of Kansas located in close proximity to a massive "wind farm" project that began its tower erection construction phase last week in Nemaha County, Kansas.  The Soldier Creek Wind LLC project by NextEra Energy, Inc. is proposed to have 140 separate wind towers, each 499 feet in height, in a densely arrayed footprint in southern Nemaha County, Kansas, a relatively highly populated rural county with over 10,000 residents.  The footprint of the project will completely surround two Kansas municipalities with distinct city councils and traditional main street, Corning, Kansas, Goff, Kansas, and Wetmore, Kansas and within two miles of two additional cities, Centralia and Kelly.

2.      This project heavily impacts the environment around Plaintiffs' properties

---

[1] At 499 feet, each skyscraping tower is close in size to The Washington Monument in Washington, D.C. (555ft.). By comparison, the tallest building in Kansas is only 386 feet tall and the Kansas State Capitol Dome is only 382 feet tall. https://en.wikipedia.org/wiki/List_of_tallest_buildings_in_Kansas

and residences and is being constructed without adequate review, oversight, or involvement by a number of federal agencies in contravention of multiple federal statutes. Plaintiffs bring this Class Action Complaint & Demand for Jury Trial and other injunctive relief against Defendants NextEra Energy, Inc. all of its wholly or partially-owned subsidiaries to include Soldier Creek Wind LLC and those listed in the caption of this case (hereinafter "NextEra" or "Defendant"), and the United States and its subordinate executive branch entities listed, to enjoin further construction of this massive project that will cause irreparable harm and a radical transformation of Plaintiffs' and the putative class' surrounding environment.  It is further being rushed into final construction prior to the undertaking of, or as a result of deficient, statutorily mandated processes, approvals, determinations, and adjudications that have deprived, have harmed and will harm Plaintiffs' rights and interests.  Further, NextEra will operate these wind tower turbines near residential communities in a way that will cause a nuisance and interfere with property owners' and lease holders' use and enjoyment of their property.[2]

3.      Plaintiffs assert that the United States Government (hereinafter "Government") has failed to comply with federal law to include but not be limited to the National Environmental Policy Act (hereinafter "NEPA"), the Endangered Species Act, and the Indian Religious Freedom Act. For instance, there is an airport in the vicinity of the project that is used extensively for crop dusting. It involves low level flying all over the area, which shortly will include the need to dip down under and around the 140 wind towers currently being erected.  This creates a serious aeronautical hazard for both the

---

[2] For comparison purposes, NextEra's Soldier Creek Wind project in this case involves more than 3.5x the number of wind towers (140) in a county that has more than 3x the population density than NextEra's Nebraska project that is the subject of a class action suit in Florida: *Kohmetscher v. NextEra Energy, Inc.*, Case 9:19-cv-80281-DMM.

airplanes and the property owners into whose homes and on whose property the planes could easily crash. However the NextEra defendants seem to be presumptively rushing hoping to complete enough work so a judge would never dare to order them removed.

**JURISDICTION**

4.      NextEra has begun to construct wind towers in a location that will have a very serious negative impact on the environment as will be later set forth.  Several federal agencies have failed to take action herein under the National Environment Policy Act ("NEPA") 42 U.S.C. §§ 4321-4377, the Endangered Species Act 16 U.S.C. §§ 1531-1544, to include but not limited to 16 U.S.C. § 1540 (g)(3)(A), and pursuant to Indian land protection duties under Chapter 5 of Title 25 U.S.C. to protect Plaintiffs and others. Plaintiffs, by virtue of their homes' close proximity to this project, are in a position to suffer monumental damage from the negative environmental impact from Defendants' actions.  5 U.S.C. § 706 provides for judicial review and injunctive relief "to compel agency action unlawfully withheld or unreasonably delayed." As such this Court has jurisdiction by virtue of 5 U.S.C. § 706.

5.      Plaintiffs further allege that the Defendants same proposed actions threaten a nuisance under Kansas State law, which is so related to claims in the action under NEPA, within the Court's original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction over those claims under 28 U.S. Code § 1367.

6.      The central offices of the United States are located in this district. Defendant NextEra has chosen to participate in a business heavily subsidized by the United States that requires it to work extensively with government offices located in this district, often requiring permits to proceed, as well as, negotiating the details of how best

to gain their windfall of billions of dollars in taxpayer subsidies from modest income rural taxpayers like Plaintiffs and without which this gigantic nuisance would not even be economically feasible.  Such contacts constitute continuous and systematic business in this district.  As such, this action arises from Defendant NextEra and its subsidiaries transacting business in this district.

7.     Westar Energy is a Kansas Corporation and partner in this project with NextEra.  They have agreed to purchase and possibly transport the electricity produced from the project.  They will be transporting and Interconnecting the NextEra project into the national electric grid, which will require FERC approval prior to occurring.

**PARTIES**

8.     Plaintiff Justin Stallbaumer resides in Kansas, not far from the small village of Corning, Kansas and his property is in the midst, within three miles, of 50-60 proposed giant NextEra wind towers in Nemaha County, Kansas.  He is a "non-participant" in the Soldier Creek Wind LLC project.  The building of these proposed towers will immediately impose a radical transformation on his property and the immediately surrounding terrain such that it will change the very nature, use, and value of his property should the project move forward and get constructed.

9.      Plaintiff Jeremy Mattwaoshshe is a citizen of the Kickapoo Nation and Indian Tribe living on their sovereign land and federally recognized Native American Reservation that runs adjacent to the eastern edge of the huge Soldier Creek Wind LLC wind tower project.  He was not aware of the massive size nor scope of the wind project

until recently and is not aware of any consultation throughout the years of planning by any Defendants, whether NextEra subsidiaries or the Government, concerning this project that will soon forever damage and impact his and his Tribes rights and interests.  He did not have any idea that each of the 140 towers were nearly 40% taller than the Kansas State Capitol Dome and the tallest building in the state.  He did not know that the massive towers each will have bright, blinking strobe lights flashing in distracting synchronicity and intensity 365 nights a year, all night in perpetuity.  He did not know that these massive spinning structures were known as "Bird Killers" and will almost certainly kill, harass, and/or wound Bald Eagles, Hawks, and other precious wildlife that hold religious and sacred significance to him and his Kickapoo Indian history and heritage.  For Mr. Mattwaoshshe, the clear mortal threat posed by these huge structures has heightened personal significance as his last name is a native phrase roughly translating in English to mean "Thunder Bird."

10.     Defendant NextEra Energy, Inc., is a for-profit corporation incorporated under the laws of Florida. Defendant is engaged in power generating activities on a worldwide basis, to include other locations within the United States. They are the world's largest wind power generating corporation.

11.     Defendant Soldier Creek Wind, LLC, NextEra Energy Resources LLC, NextEra Energy Constructors LLC, NextEra Energy Marketing LLC, NextEra Energy Operating Services LLC, NextEra Energy Project Management LLC, NextEra Energy Transmission Southwest LLC, and other unnamed subsidiaries of NextEra Energy, Inc. are subsidiaries of, and significantly controlled by, parent corporation NextEra Energy, Inc. of Jupiter, Florida but are incorporated under the laws of the state of Delaware.

12.     Defendant United States is a sovereign; and its subordinate departments and agencies are all part of one, unified executive branch for liability and pleading purposes.  The Department of Transportation is a subordinate department of the Government.  The Federal Aviation Administration is an administration subordinate to the Department of Transportation and the FERC is an 'independent' Commission but part of and subordinate to the one, unified executive branch of the United States Government. Likewise, the Department of Interior and the Department of Justice are all subordinate departments of the Government.  The Government and its subordinate elements in the executive branch are responsible for carrying out federal laws such as the National Environmental Policy Act (hereinafter "NEPA"), Endangered Species Act, Indian Religious Freedom Act, and other listed, referenced, or implied as being so listed in this Complaint.  The Secretaries listed have supervisory responsibility over their agency actions and omissions.

## NATURE OF THE ACTION

13.      Defendant is a world-leading electric utility company generating billions of dollars in revenue, a great deal of which comes directly from, and would not have been economically-feasible, but for the tremendously generous laws and green-new-deal policies and subsidies from the Federal Government.  Such massive incentives and financial assistance come in the form of hundreds of millions in tax breaks and other subsidies, including a stunning lifetime tax exclusion from the State of Kansas for this project.

14.     Despite these tax incentives, the NextEra Defendants try to further maximize profits at the expense of, and off the backs of modest-income rural Kansas

taxpayers like Plaintiffs who have also been subjected to years of overly-aggressive NextEra bullying to ensure their corporate goals would not be frustrated.  Local municipal officials and residents alike have, essentially, been bum rushed and intimidated into silence in this small farming community.  The pattern has been the same across the Midwest landscape with ungrateful subsidy-hoarding conglomerates like NextEra and its blinding array of subsidiaries and affiliates dismissively treating the local community with aggressive, even unlawful, business practices and tactics in open disdain for the concerns, rights, and well being of those local communities who have to bare the consequences of their unnatural wind tower colossuses without any meaningful compensation or say in the matter.

15.     While NextEra is no doubt proud to be among the biggest wind energy companies in the world and has taken these huge tax subsidies from modest taxpayers like Plaintiffs, they have refused to recognize the legitimate concerns and harm caused by the way they both steam-roll locals and play hide-the-ball from federal oversight concerning the very real environmental implications of these massive wind tower arrays, particularly the Soldier Creek Wind LLC project which is the second largest in the entire state of Kansas, yet will loom over a fairly heavily populated rural community, most of whom are "non-participants."  Their rights are also recognized in the present action seeking to halt this unusually large and harmful project from proceeding any further without adequate federal oversight or study, particularly from the Department of Interior, Fish and Wildlife Service ("FWS").

16.     These unsuspecting, hard working ranchers and farmers are about to be thrust, almost overnight, into the middle a maze of giant, dizzying, metal and composite

mechanical beasts towering down on their homes and properties 24/7 and 365 days a

years in perpetuity even if they "opted out" of Defendants' meager lease and contract

offers.  It will result in certain Bald Eagle and other Endangered Species kills, maiming,

and harassments.   Nonetheless, NextEra is about to force upon them the involuntary

consequences of NextEra's total transformation of their once idyllic, bucolic, and

cohesive rural landscape.  Their daily lives will forever be subject to the looming

presence, consequences, and invasion directly down upon them from these monstrous

structures where just days prior they were able to peacefully enjoy their natural little

patch of quiet prairie.

   17.  These towering structures are not without serious risk to health,

environmental impact, safety, and the quiet and peaceful enjoyment of property.

   18.  The Soldier Creek Wind LLC project of Nemaha County, Kansas, is

uniquely large and expansive even among NextEra wind projects.  It will be among the

largest few in Kansas and among the largest approximately 30 or so in America --

perhaps the largest relative to population in close proximity.  It presents a particularly

dense and massive array of wind turbines reaching 499 feet tall and numbering 140

towers within a relatively small square mile footprint in a once open, rolling patch of

Kansas prairie.  Before the small community of Corning, Kansas was intimidated into

settling with NextEra a few months ago for a reported sum of a few hundred thousand

dollars, miniscule in relation to the damage caused by NextEra, it was estimated that their

proposed three-mile exclusion ordinance around that city would have knocked out 56

towers.

   19.  NextEra, realizing the devastation to populated environments like

Corning, Kansas, first sought out "leases" by deliberately concealing the devastation it knew these towers caused to the environment and the living space of the ranchers and farmers, many of whom had lived on their properties for generations. Plaintiff Stallbaumer wisely rejected NextEra's "lease" and contract offers, realizing the extent of the harm this would cause.

20.     Although unsuccessful in concealing and deceiving enough local residents into signing these leases, NextEra focused on the largest and wealthiest landowners and went ahead to start building anyway.

21.     Common sense speaks to anyone in that situation to say Mr. Stallbaumer is now confronted with an imminent and very serious and significant nuisance and diminution of rights and interests to him and his property for which he has received nothing in compensation and had no real say in its "approval" process other than a couple of minutes of perfunctory talk time at a town hall or a few cents, per capita, of tax revenue to pay a fraction of the likely road damage from huge industrial vehicles marring the roadways and bridges around the county.  This suit is his, and Mr. Mattwaoshshe's as discussed later, and the Putative Class' opportunity to finally have their legal rights and interests heard, taken seriously, and recognized before their entire lives and properties are forever transformed and diminished.

22.     The Plaintiffs and the Putative Class will all face the same fate in a few days, if the Court does not step in to enforce legitimate and justified injunctive relief in the face of NextEra's accelerated construction efforts.  This is due to the statewide stay-home Executive Order based on the Declared State of Health Emergency for Covid-19 that they have been flouting for months since NextEra is no currently nor in the

reasonably foreseeable future qualified under the Governor's "essential services" exemption given that they are not currently "generating" nor "transporting" electricity. NextEra and their subsidiaries have been gathering for several months in groups of approximately 50-100 mostly out-of-area contractors to have coordination meetings without proper health precautions at their tiny office trailer located east of Corning, Kansas.

23.     NextEra is clearly rushing head-long to raise towers  in order to create a *fait-a-compli* in which their 140 monster towers will be standing and likely never be ordered taken down even if they are unsuccessful in litigation.  There is sad recent precedent for this in this very Circuit in *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), where Plaintiffs sought an injunction fearing the Court would never order these multi-million dollar structures taken down even if they prevailed on the many claims.  While given assurances to the contrary that is exactly what happened. They prevailed on the merits but another Court concluded it would be waste to then tear them down after they had been erected and operating.  That is the ultimate injustice for Plaintiffs to pour years of effort, emotion, and resources into litigating legitimate claims, to then taste the bitterness of the ultimate pyrrhic victory.  It should not be allowed to happen in this case.

24.     As a general idea, "wind farms" are legitimate renewable sources of electricity but they also pose real dangers, consequences, and uncompensated damages to locals, not to corporate executives living thousands of miles away from the nearest blighting wind tower array.  When built in too high of concentrations, like in the Soldier Creek Wind LLC scenario, and without proper set-back to homes, work and recreation

areas, and residential communities they present nuisance and injuries to the environment and local heritage sites. NextEra must be required to confront the entirety of its environment, heritage, and civil nuisance liabilities in the open, before they build, not just play the system to escape legitimate scrutiny.

25.     The 140 towers with three rotating 260 foot long blades, and their quick-flash strobe lights firing in sync each few seconds, will present an imposing and intruding disturbance and generate significant amounts of noise that will be especially agitating in the normal, bird-chirping quiet of rural America. The noises are diverse in nature but also continue, often with 24/7 consistency, with deep thumping regularity akin to an approaching helicopter that never seems to land or depart the area. The sound can be constant for days, depending on the weather, and experienced by residents miles away. But is experienced with devastating effects by those living only 2000 feet away, approximately only 1/3 of a mile or the equivalent of a few city blocks[4], which is all that is required by current NextEra and Nemaha County supervisors' "negotiated" agreement for homes that are "non-participants" in NextEra's "wind farm" soon to stand high atop Plaintiffs' homes. Reports indicate the residents living within several miles of these towers suffer damage and harm to their quality of life from adverse health and well being from stress, anxiety, and significant sleep disruptions.

26.     For reference, while standing at ground level within this project's footprint in the open prairie of Kansas, the top 1/3 portion of the wind towers at the Flat River Wind 'Farm' are visible, a distance of more than 25 miles. The Flat River project is a similar yet much smaller array of wind towers just over the state line with Nebraska. At

---

[4] In the open terrain of rural, rolling hills Kansas that is very close.

night from the same ground level vantage point, their synchronous strobe lights, 260 or so feet *below* the ultimate tower height, flash bright and are attention grabbing at over 25 miles distance.  Those towers are smaller in size and smaller in number, 40 compared to NextEra's 140.  The Kickapoo Nation Reservation is only four miles away from the line of proposed towers along the western edge of the Soldier Creek Wind LLC project.  All of the 140 proposed towers in NextEra's project are much closer to the Kickapoo Nation Reservation than the distance to the current Nebraska towers with the imposing strobes and visibility.  Mr. Stallbaumer's home has as many as 50-60 of these giant strobe light and helo-thumping towers within 3 miles in a 360 degree circle around his home.

27.     Some of the adverse consequences of wind towers include the flickering shadow effect from angled sunlight also known as 'shadow flicker' causing attention and mental fatigue and agitation.  Sufferers have complained of severe physical and mental effects as a result.

28.     NextEra has ignored, or failed to take responsibility, for primarily choosing locations for the wind towers based on maximum profits while refusing failing to mitigate the often devastating effect on local residents and communities when siting these giant devises near farmsteads, homes, work and recreation areas, and roadways.

29.     They further antagonize and damage individuals and these rural communities by pitting participating members against non-participating members in pitched political maneuverings that have severely damaged and torn apart the normally cohesive, peaceful, supportive, and unified character of Nemaha County, Kansas. Defendants' actions have exacerbated stress, anxiety, and even fear with their bullying and bare-knuckle strategies and tactics.  They have even resorted to potentially criminal

intimidation of an elected public official on the City Council of Corning, Kansas in the exercise of official public duties and First Amendment activities. NextEra with their partner Westar Energy conspired to hire this elected, public opponent of the Soldier Creek project approximately one year ago. Then about 10 months after inking that agreement, the man was subjected to a targeted[5] effort to silence him in or about October 2019, when he was called in to the corporate headquarters office and was threatened with firing from this lucrative job with Westar just six months into his new-hire probationary period if he did not immediately halt all public opposition to the Soldier Creek project on forums like Facebook and instructed to "have no opinion" in the future on the Soldier Creek project. At that time, he and his fellow elected city councilmen were in the middle of preparing an ordinance for a three-mile tower exclusion zone around the city limits as part of his official duties as an elected Corning, Kansas official. Not only did he immediately take down his opposition information page on Facebook and immediately abstain from all voting on the NextEra project, he also abruptly left his position on the City Council weeks later. Before this incident, he reportedly told people his new job with Westar was his dream job.

30.     This act of intimidation and sudden and immediate reversal from one of the leading public opponents of the project sent a chilling signal to all local officials and residents alike. It intimidated locals and the opposition eventually resulting in a series of events that advantaged NextEra's political machinations and stopped all municipal restrictions from Corning, and other local municipalities. The opposition never recovered from this act of intimidation.

---

[5] https://www.spglobal.com/marketintelligence/en/news-insights/trending/gvi2_iiheu_lejl9oqqxza2

[7].https://oeaaa.faa.gov/oeaaa/external/searchResults.jsp?action=searchDeterminedCases&pageNu

31.     Even local residents unconnected with official positions expressed reluctance to voice opposition to the project fearing some kind of gag order or lawsuit from NextEra that would result in some kind of legal liability having heard of the depths of bullying and intimidation NextEra had already shown.

32. Given the adverse health and well-being effects, stress, property interference to local communities and residents within several miles of these large scale "wind farms," local residents have been driven people from homes and farmsteads and ruined the beauty of their once bucolic rolling rural landscapes with a massive array of unnatural skyscrapers made of metal and plastic that constantly signal to them with giant rotating arms as big as industrial buildings.  These escaping locals suffer the added harm of substantially lower land values in, among, and near these projects.  In fact, often the market goes to zero, meaning no one wants to buy these properties.

33. As such, these claims are brought on behalf of Plaintiffs and those similarly situated to obtain injunctive relief and damages for the imminent harm due to NextEra's actions and imminent erection of 140 towers in a patch of ground in Nemaha County, Kansas and that will immediately affect their lives and property.

34. Plaintiffs seek injunctive relief and an award of damages compensating them and the putative class members for the negative effects that Defendants' densely packed, massive wind towers have, and will have, on health and well-being, use and enjoyment of their property, and diminution in value of their property. Plaintiffs also seek a permanent injunction barring Defendant from continuing to unreasonably interfere with their and the putative class members' use and enjoyment of their property.

### FEDERAL AVIATION ADMINSTRATION ("FAA") FAILED TO FOLLOW FAA RULES ON NEPA, DID NOT PERFORM REQUIRED "EXTRAORDINARY

CIRCUMSTANCES" ANALYSIS BECAUSE WOULD HAVE CLEARLY REALIZED
PROJECT WAS NOT ELIGIBLE FOR CATEX PER FAA RULES AND REQUIRED
FULL NEPA EA OR EIS

35.     NEPA is the "basic national charter for protection of the environment;"
and it is geared to "help public officials make decisions that are based on understanding
of environmental consequences, and to take actions that protect, restore, and enhance the
environment," and to "insure that environmental information is available to public
officials and citizens before decisions are made and before actions are taken." 40 C.F.R.
§ 1500.1(a) to (c).

36.     The Council on Environmental Quality ("CEQ") oversees NEPA matters
within the Executive Branch which are "binding on all federal agencies." *Id.* § 1500.3.
Public involvement, including local citizen hearings, is a critical aspect of valid NEPA
review concerning an agency's proposed actions, its impacts, and reasonable alternatives
regardless of whether an agency ultimately prepares an EA or EIS. By regulation federal
agencies "shall to the fullest extent possible . . . encourage and facilitate public
involvement in decisions which affect the quality of the human environment." *Id*. §§
1500.2, 1506.6(a). Thus, "NEPA procedures must insure that environmental information
is available to public officials and citizens before decisions are made and before actions
are taken." *Id.* § 1500.1(b).  Thus far any such NEPA activity has been conducted, if at
all, in secret with NextEra hidden from public view.  That is contrary to law.

37. The nature of wind "farms" is likely well known.  They involve the close
grouping of a large number of huge wind turbine towers to concentrate and more
efficiently collect wind-generated electricity. The huge towers in NextEra's Nemaha
County project case will each be 499 feet high and have three rotating blades each of

about 260 feet long.  At the top, the three blades will also swivel in a 360-degree arc completely around the central pole to better face the prevailing wind.

38. Given their massive size and height, each of the proposed tower sites was required to be submitted to the FAA for a study and determination as to whether it posed a risk to aviation pursuant to 14 CFR 77.9, in Part 77.

39. On May 4, 2020, the FAA made 140 separate determinations that the huge collection of 140 towers poses "No Hazard" related to aviation safety.[7]  In their decision, the FAA failed to even consider the air safety aspects related to an adjacent, heavily used agri-business airport with a concrete runway critically important to the agricultural interests of the surrounding community.  This runway points directly into a huge concentration of these soon-to-be erected fatal air obstacles, each as mentioned nearly 40% taller than the State Capitol Dome and tallest building.  No mention was made in their determination of the obvious safety issue posed by NextEra's densely arrayed towers that those pilots will now have to dip down under, around, and between during the thousands of passes per year when spraying thousands of crops acreage within and around the footprint of this massive project.  This airport is also a regional hub for multistate agri-spray operations as the airport is the headquarters for that growing business and a maintenance hub.  Yet, no mention whatsoever in the FAA's determination.

40. Part C of 14 CFR 77.9 entitled, "Standards for Determining Obstructions to Air Navigation or Navigational Aids or Facilities," Section (a) reads: "This subpart describes standards used to determine obstructions to air navigation that may affect the

---

[7].https://oeaaa.faa.gov/oeaaa/external/searchResults.jsp?action=searchDeterminedCases&pageNum=5

safe and efficient use of navigable airspace and the operation of planned or existing air

navigation and communication facilities." 14 CFR 77.15.[10]

41.  It is clear that the FAA did not adequately or reasonably address the special

circumstances involved in "crop dusting" operations only two miles straight off the

runway from this approaching gauntlet of NextEra wind towers.  These new obstacles

will require planes to dip below the 500 foot level in order to carry out their normal air

operations.  Any reasonable review and determination would have had to at least

reference this known and glaring aeronautical issue that presents such an obvious concern

invoking the prohibition on such construction under Kansas law.

42.  Further construction should be enjoined also due to its air safety hazards

contrary to Kansas law.  K.S.A. 3-702 states, "**Airport hazards contrary to public

interest.** It is hereby found that an airport hazard endangers the lives and property of

users of the airport and of occupants of land in its vicinity, and also, if of the obstruction

type, in effect reduces the size of the area available for the landing, taking-off and

maneuvering of aircraft, thus tending to destroy or impair the utility of the airport and the

public investment…interest therein. ***Accordingly, it is hereby declared: (a) That the

creation or establishment of an airport hazard is a public nuisance and an injury to the

community served by the airport in question; (b) that it is therefore necessary in the

interest of the public health, public safety, and general welfare that the creation or

establishment of airport hazards be prevented***."  K.S.A. 3-702 (emphasis added).  See

paragraph 51 below for more discussion about the very real air safety hazard issue.

---

[10] It is legitimate to add that even though the towers are slated to be 499 feet tall, in a typical driving
Kansas ice or snow storm 12 inches of additional ice or snow buildup will instantly place all 140 of
the towers into a totally different regulatory status by virtue of reaching 500 feet. That is not only a
possibility but realistic in the winter months particularly at that high, windy, unobstructed altitude.

43. This project represents "the establishment of an airport hazard" and "is a public nuisance and an injury to the community served by the airport in question."  Until full air safety analysis can be performed, these huge towers pose an imminent threat to the safety, not only of pilots but local citizens living among these huge towers, particularly Plaintiff Stallbaumer.  Thus, further construction should be enjoined until such thorough review and study, and necessary mitigation alterations like the elimination of the number and density of these towers, is completed.

44. Subpart B of § 77.5(c)(1) and (2) states the reason for submission like NextEra's is that the FAA will then engage in the following: "1) Evaluate the effect of the proposed construction or alteration on safety in air commerce and the efficient use and preservation of the navigable airspace and of airport traffic capacity at public use airports;(2) Determine whether the effect of proposed construction or alteration is a hazard to air navigation."

45. While the FAA holds that Part 77.9 determinations are given a Categorical Exclusion (hereinafter "CATEX") for NEPA purposes, that is not the end of the story as FAA internal guidance clearly instructs.  A recent Memorandum from the head of FAA's Environmental Compliance Office, Ms. Andrus, is clear that even if a CATEX applies, that does not excuse the agency from performing some measure of requisite analysis concerning whether "Extraordinary Circumstances" are at play with the particular project because, if one of the "Extraordinary Circumstances" does apply, a simple CATEX check mark will not suffice and is absolutely inadequate and inappropriate.  The FAA clearly did not perform even that minimal level of NEPA/CATEX "Extraordinary Circumstance" analysis and thus, Plaintiffs respectfully submit that a Mandamus Order, pursuant to 5

U.S.C. § 706 must be issued from this Court to both (1) require the FAA to perform a
full, interagency and public, EIS process given the multiple Extraordinary Circumstances
involved with this project and (2) to enjoin NextEra from any further construction until
that process is complete given the very obvious environmental impacts, and serious
questions, presented with hits huge project.

46. As explained in the July 13, 2019 Memorandum from FAA's Katherine
Andrus, Manager, Environmental Policy and Operations, Office of Environment and
Energy (AEE-400) (See link in Footnote below): "**CATEXs are not exemptions from
NEPA; rather, they are one type of NEPA review. Like an Environmental
Assessment (EA) concluding in a Finding of No Significant Impact (FONSI), a
CATEX supports a decision not to conduct additional environmental review and,
used appropriately, satisfies the requirements of NEPA.**"[11]  As clearly stated, a
CATEX is in no way an exemption from the requirements of NEPA.  It is simply a
separate type of NEPA review, shortened to only look to whether any of the
Extraordinary Circumstances are at issue with a project.  There is absolutely no indication
that any NEPA consideration, let alone a review, analysis or coordination, of any kind
has been performed by FAA or any Government entity so far on this project.  But the
FAA has clearly failed to comply with internal rules on the matter.   To make matters
worse, the FAA appears to have engaged in rulemaking that goes too far by attempting to
give themselves a regulatory exemption from the minimal statutory requirements, and
internal rule, requiring the that some measure of analysis and review be done with a
project of this kind to determine whether any of the "extraordinary circumstances" apply

---

[11]https://www.faa.gov/about/office_org/headquarters_offices/apl/environ_policy_guidance/policy/faa_nep
a_order/media/catex_use_memo.pdf

that would render a CATEX "inappropriate" and require that an EA or EIS be completed. The FAA attempts to dismiss statutory requirements regarding Extraordinary Circumstance analysis from it Part 77.9 rule: "*Environmental Analysis:* FAA Order 1050.1E identifies FAA actions that are categorically excluded from preparation of an environmental assessment or environmental impact statement under the National Environmental Policy Act **in the absence of extraordinary circumstances**. The FAA has determined this rulemaking action qualifies for the categorical exclusion identified in paragraph 312f **and involves no extraordinary circumstances**."  (emphasis added). **42302 Federal Register**/Vol. 75, No. 139/Wednesday, July 21, 2010.   The FAA cannot by regulation exempt agency from individual project "extraordinary circumstances" analysis required by regulation and statute.  And, the FAA certainly cannot ignore the clear Extraordinary Circumstances involved in this huge NextEra project which should have rendered a CATEX inappropriate and required an EA or EIS.

47.     Given the massive scope, number of obstructions, and densely packed nature of this proposed project in a heavily air trafficked[12] and relatively populated area,

---

[12] For the FAA, in particularly, a very substantial factor involved with this project has to do with the fact that one of the busiest multistate regional agricultural aerial spray airports is located less than two miles straight off the south facing runway into this massive and towering maze of 140 new, potentially fatal obstacles.  In the strong winds of a Kansas spring, these single engine aircraft will be required to negotiate among towering, potentially fatal new structures in order to land at that busy runway pointing directly into a soon-to-be erected gauntlet. The company that has built and runs this 'crop dusting' operation is Heinen Brothers AgriServices, Inc. out of Kelly, Kansas, another small rural community within only a few miles of the NextEra footprint. Heinen Brothers aircraft operations is not simply a tiny local crop-dusting shop with one or two small planes and a few local customers.  The Heinen Brothers' airport facility has a substantial concrete runway that takes off directly at these tower locations straight off its south facing runway.  The FAA has an solemn responsibility to fully evaluate the Heinen Brothers operation and fairly and reasonably determine whether a serious or substantive threat to safe aviation and the lives and equipment of this very substantial aircraft operation is presented by NextEra's towers. Heinen Brothers national headquarters is located at that airport just a few farm fields away from this forest of wind tower skyscrapers. *See* https://heinenbrosag.com.  They are currently in their busiest crop spraying season out of that airport.  They have customers in the middle of this new forest and must descend down to mere feet above the crops in order to spray safely and comply with USDA regulations. At the same time they will have to dodge these

it would seem obvious that "extraordinary circumstance" would have leapt out at a reviewer.  It appears they even failed to account for all the air hazard issues unique to the project, let alone the obvious Endangered Species Act, Migratory Bird Treaty Act, National Historic land mark issues, and Indian Heritage implications involved.   As such, it appears that not even a cursory review has been performed; and thus, **the FAA has failed to satisfy the statutory obligations of NEPA related to this project.**

48. NEPA requires federal agencies to fully undertake the necessary public/private study, analysis, and evaluation -- usually an EIS -- when projects with such magnitude and significant impact on the human environment are involved. *see* 40 C.F.R. §§ 1500–1508.

49. Again, FAA senior official Ms. Andrus' Memorandum: "Order 1050.1F, para. 5-2.b lists twelve circumstances that, when applied to a specific action, assist in identifying situations that require further consideration before using a CATEX to satisfy NEPA. Evaluating the potential for significant impacts under these circumstances may require screening, preliminary analysis and/or consultation…**If the proposed action**

---

500 foot tall towers with three 260 foot long rotating arms each spread wide and pivoting on a horizontal rotating masthead to best face the wind.  The aircraft, as well, must face the wind to maximize aerodynamics meaning both will flying against the same wind when they "interact."  Heinen Brothers aerial operations reach as far as Idaho, Minnesota, and the southwest United States.  Many of those flights and aircraft must originate and return to the large maintenance hangars located at this airfield right amidst the proposed Soldier Creek Wind LLC towers.  Hundreds and hundreds of take offs and landings and miles-long approaches are performed in and out of that south facing runway each month in the busy agricultural seasons of the year, meaning now through September. The Heinens have been adamant that this proposed project creates an "extraordinary circumstance" in terms of the level of danger posed by these 140 massive structures nearly twice as tall as the State Capitol Dome and far higher than any natural terrain normally found in that region of the country.  Any potential danger posed to aviation within the footprint of this project poses a public health and well being hazard to all, with potentially fatal consequences, for residents and communities in or near the footprint of these aeronautical obstacles.  Plaintiff Stallbaumer lives in the middle of the vast wind turbine footprint and is endangered and could suffer harm by the tower's existence and operation.  Plaintiff Mattwaoshshe actually works in the fields, and directly under, the area in which these flying agri-spray planes will have to bob and weave around 140 new potentially fatal obstacles.

**involves any of the circumstances listed in para. 5-2.b of the Order AND the action has the potential for a significant impact under those circumstances, a CATEX may not be used…An EA or EIS must be prepared unless the proposed action is modified to eliminate the potential for a significant impact.**" (emphasis in original) *Ibid* at 2.  NextEra's construction currently underway is now in the process of raising 140 new massive wind towers with huge protruding 260 foot rotating arms less than two miles from an extremely busy agribusiness airport with hundreds of take offs and landings a week.  The operators of that airport vociferously opposed this project and desperately tried to inform people that it presented a mortal danger to themselves and their pilots and aircraft with its densely packed towers hovering over a higher,  well populated area that includes four distinct municipalities.  A cursory view of Department of the Interior's Fish and Wildlife Service (hereinafter "FWS") website shows clear evidence that endangered and threatened birds and bats, even fish, are present in that exact area that should have resulted in consultation with FWS at the very least.  Plaintiff Stallbaumer observed six Bald Eagles circle overhead while he plowed his fields several weeks ago.  His neighbor took pictures a few weeks prior of Bald Eagles with apparent adolescent birds a possible indication of nesting.  Exhibit B.  Further, it should be fairly common knowledge among anyone performing an environmental review of some kind, even a CATEX, that "wind farms" have been known as "Bird Killers" for the unusually high number of bird kills they generate due to their massive 260 foot arms that spinning up to 140 mph catching nearly every and any flying object, including birds or a plane, caught in their path unsuspecting and incapable of avoiding instant death or destruction.

50. Upon even cursory analysis, the second prong cited in the FAA NEPA
Memorandum concerning "significant impact" is triggered.  Likewise, the second prong
concerning the question of whether the project involved one of the twelve "Extraordinary
Circumstances" should have also been easily recognized by FAA reviewers.  It should
have alerted FAA staff that a CATEX was not appropriate under FAA rules.

51. That list found at Order 1050.1F, para. 5-2.b includes the following
independent grounds; any one of which would make the CATEX not appropriate as the
project's Extraordinary Circumstances clearly required a NEPA Environmental
Assessment ("EA") or full Environmental Impact Statement ("EIS").  Given that so many
very significant Extraordinary Circumstances are involved with this single project,
anything less than an EIS cannot suffice to fully review the impact on the human
environment, especially given the need for technical environmental expertise needed
from other agencies like FWS.  Below is just a cursory discussion of the 9 separate
Extraordinary Circumstances the are implicated by the massive Soldier Creek Wind
LLC/NextEra wind tower project.  FAA Order 1050.1F, para. 5-2.b:

(A):  *"(1) An adverse effect on cultural resources protected under the
National Historic Preservation Act of 1966, as amended, 54 U.S.C. §300101 et
seq.*"  This massive new grouping of 140 structures will be easily visible from
ground level and loom large from only over a few miles distance of two separate
National Park Service officially designated historic sites.  The Pony Express
National Historic Trail, a designated byway commemorating the actual route of
the famous Wild West Pony Express mail service.  Two other officially
designated sites are also very close if not within the footprint of the project: (1)

the Fort Leavenworth-Big Blue River of the California National Historic Trail[14]

and (2) the scenic Saint Joe Road National Historic Trail.  Both mark historic

Pioneer roads used during the period of our Nation's Westward Expansion,

establishing what is now the modern American landscape.  The National Park

Service has a map designating the Pony Express National Historic Trail which

unmistakably shows that NextEra's massive Soldier Creek Wind project will be

within only a few short miles, if not within the footprint, of this designated federal

landmark.  Yet no discernable NEPA thought or consideration has been given to

it.  NextEra is only a few hours away from permanently impacting these

historically designated treasures.  See map

https://www.nps.gov/poex/planyourvisit/maps.htm and

http://www.kansasheritage.org/werner/ponyroad.html (note reference the

Kickapoo Indian Nation's Reservation four miles from the eastern line of towers

raising serious Native American heritage NEPA issues requiring study) and

http://www.kansasheritage.org/werner/

        (B):  *"(3) An impact on natural, ecological, or scenic resources of Federal,*

*state, tribal, or local significance (e.g., federally listed or proposed endangered,*

*threatened, or candidate species, or designated or proposed critical habitat under*

*the Endangered Species Act, 16 U.S.C. §§ 1531-1544)."*  See previous discussion

of National Park Service officially designated National Historic Trails in very

close proximity that would have their "natural" and "scenic resources" abused as

the towering, strobe-lit wind generators can easily be seen from ground level from

---

[14] https://www.nps.gov/cali/planyourvisit/maps.htm

these National Historic Trails.  See later discussion on the harmful impact

Plaintiff Mattsaoshshe and his Kickapoo Nation and reservation lands will surely

endure if these towers are allowed to continue to be built without any review of

their impact on Native American heritage and lands.

(C):  *"(4) An impact on the following resources: resources protected by the*

*Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-667d; wetlands;*

*floodplains; coastal zones; national marine sanctuaries; wilderness areas;*

*National Resource Conservation Service-designated prime and unique farmlands;*

*energy supply and natural resources; resources protected under the Wild and*

*Scenic Rivers Act, 16 U.S.C. §§ 1271-1287, and rivers or river segments listed on*

*the Nationwide Rivers Inventory (NRI); and solid waste management.*"  As

discussed herein, massive "wind farms" like this project are know to be "bird

killers."  With the migration of millions of birds directly through that area, often

seen at lower or even ground level as they can be attracted to the many water

sources like nearby Centralia Lake or the waters and marsh (wetlands) areas of

Nemaha County Lake, which would take them right into the waiting gauntlet of

the spinning turbine arms.  This particularly dense and numerous concentration of

dangerous wind tower turbines absolutely implicates and likely runs afoul of the

federal *Migratory Bird Treaty Act*, 16 U.S.C. 703 *et. seq.*, the *Endangered Species*

*Act*, 16 U.S.C. 1531 *et. seq.*, and the *Protection of Bald and Golden Eagles Act*,

16 U.S.C. 668 *et. seq.*  Bald Eagles are regularly present, even spotted within a

few feet of current tower construction sites.  Their presence is particularly heavy

during migration seasons but there also appears to be nesting in the area given the

multiple sightings of pairs with young offspring.  At the very least, it must be studied and fully reviewed, as the law requires, under formal processes of NEPA and other federal laws.

(D):  *"(5) An impact on natural, ecological, or scenic resources of Federal, state, tribal, or local significance (e.g., federally listed or proposed endangered, threatened, or candidate species, or designated or proposed critical habitat under the Endangered Species Act, 16 U.S.C. §§ 1531-1544); (4) An impact on the following resources: resources protected by the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-667d; wetlands; floodplains; coastal zones; national marine sanctuaries; wilderness areas; National Resource Conservation Service-designated prime and unique farmlands; energy supply and natural resources; resources protected under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271-1287, and rivers or river segments listed on the Nationwide Rivers Inventory (NRI); and solid waste management; (5) A division or disruption of an established community, or a disruption of orderly, planned development, or an inconsistency with plans or goals that have been adopted by the community in which the project is located."*  The radical scenic transformation is hardly describable given NextEra's overreach of building 140 monster wind towers in this stretch of prairie.  This is one of the top few largest wind projects in the State and large by national comparison, too, in a relatively heavily populated rural area with encompassing four separate municipalities and within ground level view of tens of thousands of residences due to the open landscape.  As stated, there are many more appropriate and less populated areas to build such a massive project

that would not have such a dramatic affect on so many non-participants.  See previous discussion demonstrating other cited impacts.

(E): *"(7) An impact on noise levels of noise sensitive areas.*"  As stated, there are significant noise pollution and agitation issues, especially amidst the quiet of this rural patch of land and the high concentration of towers in a relatively closer space, requiring study. There is also the valid issue of FAA responsibilities to evaluate the funneling of agribusiness aircraft by the hundreds to avoid these potentially fatal tower obstacles over very narrow and specific corridors whereas previously the approach would come from all directions and better disperse aircraft noise.

(F): *"(9) An impact on water quality, sole source aquifers, a public water supply system, or state or tribal water quality standards established under the Clean Water Act, 33 U.S.C. §§ 1251-1387, and the Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j-26."*  A high number of farmsteads in this area use well water that may be affected by the massive ground alterations and the rolling of huge industrial equipment that could have adverse effects on ground water sources, septic issues, and potential massive rerouting of runoff that could overwhelm flood prone tributaries that swell to dangerous levels with flash floods especially during Spring deluges.

(G): "*(10) Impacts on the quality of the human environment that are likely to be highly controversial on environmental grounds. The term 'highly controversial on environmental grounds' means there is a substantial dispute involving reasonable disagreement over the degree, extent, or nature of a*

*proposed action's environmental impacts or over the action's risks of causing environmental harm.*"  This proposed NextEra project has been shockingly controversial in terms of impact on the "human environment" to this normally close-knit rural Nemaha County community. 42 U.S.C. § 4332(c).  Severe stress and tension caused by NextEra's unscrupulous business practices and tactics have been palpable.  At the limited few public hearings made available, it was standing room only and about 90% vociferously opposed this massive alteration to their community and surroundings.  Yet, NextEra has been able with massive financial and guns-for-hire professional resources to game the system and be one step ahead of the busy, under-resourced rural residents at each step.  For instance, when Corning City Council was outraged by the scope of the proposed project that would forever and radically alter their beautiful rural village, they were met at every turn with the best legal and lobbying efforts money can buy.  NextEra conspired with their local business partner, Westar Energy, to threaten to fire a public opponent of the project who also sat as a voting Corning City Council member.  He was immediately cowed into submission by the threat that forced him to shut down his effective and informative opposition Facebook page and abruptly abstain from key City Council votes on the Soldier Creek project.  He then abruptly left the City Council position altogether within weeks.  This action raises the legitimate specter of whether federal extortion statutes are implicated given that the threat to fire him not only focused on his online interstate wire activities on Facebook but clearly resulted in him "having no opinion" in his official city council votes on the project.  Regardless, this community has been

scarred and shaken deeply by this highly controversial project and the actions of
Defendant NextEra, its subsidiaries and their agents/affiliates.

(H): "(*11) Likelihood to be inconsistent with any Federal, state, tribal, or
local law relating to the environmental aspects of the proposed action.*"  See
sections herein concerning Plaintiff Jeremy Mattwaoshshe's Native American
land, heritage, and religious freedom rights.

(I): *"(12) Likelihood to directly, indirectly, or cumulatively create a
significant impact on the human environment, including, but not limited to,
actions likely to cause a significant lighting impact on residential areas or
commercial use of business properties,* **likely to cause a significant impact on the
visual nature of surrounding land uses***, likely to cause environmental
contamination by hazardous materials, or likely to disturb an existing hazardous
material contamination site such that new environmental contamination risks are
created.*"  (emphasis added).  As stated and described herein, no reasonable
person can conclude that this project does not present "[l]ikelihood to directly,
indirectly, or cumulatively create a significant impact on the human
environment… likely to cause a significant impact on the visual nature of
surrounding land."  This project should scream to federal offices and NextEra
alike that a full scale NEPA is mandated, or should at least have been brought up
and considered by this point, **given the extreme way it is "***likely to cause a
significant impact on the visual nature of surrounding land uses***."** *(*emphasis
added*). Ibid*.  Yet it appears none of this has even crossed anyone's mind –
except, no doubt, NextEra's hundreds of professional advisors who no doubt have

fastidiously tried to game the leviathan systems to circumvent the federal

requirement on this breathtakingly enormous project.

**FAA Failed to Comply with Requirements of 16 U.S.C. § 1536(a)(2) and/or FAA Rules When "Carrying Out" Its Agency Action Related to NextEra's 140 Separate Air Hazard Determinations – "No Hazard" Determinations Should Be Withdrawn and NextEra Should Be Enjoined from Further Construction Until ESA Processes Complete**

52.  In addition, DoT/FAA appear to be in violation of 16 U.S.C. § 1536(a)(2) that states:

> "(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…unless such agency has been granted an exemption." (emphasis added).

Clearly, these 140 NextEra wind turbines in the Soldier Creek Wind LLC project

will "likely…jeopardize…and result in the adverse modification of habitat" of

endangered and threatened species under this Act.  The FAA failed to consult or even

consider this requirement when issuing its 140 separate "No Hazard" Determinations for

NextEra on the project in Nemaha County, Kansas.  Until such "consultation" is had on

the topic, NextEra should be enjoined from any further construction and the FAA should

be ordered to complete such consultation and necessary follow on study of the situation.

This same requirement will be necessary for FERC in its national grid "Interconnection"

approval. All paragraphs in this Complaint are incorporated herein as if set forth in their

entirety.

**Army Corps of Engineers Failed to Comply with Requirements of 16 U.S.C. § 1536(a)(2) When "Carrying Out" Its Agency Action Related to Permit Approvals for NextEra's Movement of Heavy Construction Equipment – Permits Should Not Have Been Issued Prior to Compliance with 16 U.S.C. § 1536(a)(2) and NextEra Should Be Enjoined from Further Construction Until ESA Processes Complete**

53.  The U.S. Army Corps of Engineers, as well, had an obligation to engage in consultation with the Secretary of Interior regarding the two recent permits they issued for the movement NextEra heavy construction equipment over controlled waterways on January 7th and March 5th of this year.   There is no indication that adequate consultation pursuant to 16 U.S.C. § 1536(a)(2) occurred prior to issuing the permits.[15]  The high level analysis found at 51(A)-(I) herein would alert anyone to the existence of Extraordinary Circumstances.  All paragraphs in this Complaint are incorporated herein as if set forth in their entirety.

**NextEra's Project Requires FERC Approval to "Interconnect" to the National Electricity Grid Yet No Discernible NEPA Review Has Begun and Towers are Being Built – Further Construction Should Be Enjoined Until Full NEPA Process Complete Related to FERC Approval**

54. NextEra and/or its partner Defendant Westar Energy of Kansas have a requirement to obtain approval from the Federal Energy Regulatory Commission ("FERC") under 16 U.S.C. § 796 *et. seq*., the Federal Power Act (hereinafter "FPA"), to interconnect this massive electric generation project to the national electric grid.  16 U.S.C. 824(b) and (c) reserves to FERC the authority to review and provide final determination concerning "Interconnection" of this kind involved in the Soldier Creek project: "The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale [defined as 'a sale of electric energy to any person for resale'] in interstate commerce."

55. Why NextEra has not in good faith, it appears, alerted FERC and other federal agencies to the full scope and nature of this enormous NEPA-invoking project is

---

[15] https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/6727 and
https://www.usace.army.mil/Missions/Civil-Works/Regulatory-Program-and-Permits/Nationwide-Permits/

unclear.  But they are moving at break-neck speed to erect and permanently deface this

rural community's landscape prior to the federal decision on the topic being obtained.

Again, even if FERC considers this a normally CATEX matter for NEPA purposes, they

would also first have to undergo some measure of analysis to see if any Extraordinary

Circumstances apply. See *40 CFR 1508.4*.[16]  For the same reasons cited in the FAA

determination, FERC would also not be allowed to ignore the extraordinary

circumstances presented in this NextEra project that dictates a NEPA EA or EIS be

performed.  Ideally, FAA would have already coordinated with FERC knowing of the

interagency requirements of NEPA.  But since that hasn't happened, FERC has an

independent duty to perform the EA/EIS NEPA full scope study.[17]  The analysis in

paragraphs 51(A)-(I), above, is equally applicable to all federal agency NEPA

requirements regardless of whether a CATEX exists or not because, "***CATEXs are not***

***exemptions from NEPA; rather, they are one type of NEPA review. Like an***

***Environmental Assessment (EA) concluding in a Finding of No Significant Impact***

***(FONSI), a CATEX supports a decision not to conduct additional environmental***

***review and, used appropriately, satisfies the requirements of NEPA***."[19] (emphasis

added). But, when not used appropriately, or when a corporation like NextEra is trying to

game the process and commence major tower construction without these statutory

reviews first being completed, they must be enjoined from doing so.

---

[16] "Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 CFR 1508.4.  Executive Office of the President's ("EOP") Council on Environmental Quality ("CEQ") regulations are binding on all executive branch entities.

[17] Why NextEra may not have also made judicial notice of this massive and similar project to the Court in the litigation in the Southern District of Florida is also a good question, especially since they were on notice of being enjoined related to future such projects in that case.

[19] https://www.faa.gov/about/office_org/headquarters_offices/apl/environ_policy_guidance/policy/faa_nepa_order/media/catex_use_memo.pdf

56. As stated, by all appearances, NEPA has been completely absent in this entire Soldier Creek Wind LLC planning, and now construction, process.  In a project this massive with likely huge implications for the human environment, and safety, it is unfathomable and unlawful for it to proceed any further without such documented, public, and formal NEPA processing and consideration; and any mitigation, alteration or otherwise such a process may require.

## INJUNCTIVE RELIEF RELATED TO ENDANGERED SPECIES ACT PRIVATE RIGHT OF ACTION

57.  The Endangered Species Act provides a private right of action including injunctive relief where an imminent threat to endangered and protected species is presented.  Normally such citizen suits require a 60-day Notice.  16 U.S.C. § 1540.  But Plaintiffs bring this action pursuant to a waiver of the 60-day requirement found in 16 U.S.C. § 1536(m) as follows: (1) NextEra is one of the top few sophisticated corporate actors in the NEPA/Endangered Species regulatory field; (2) as such, they unmistakably had "reason to believe that an endangered species or a threatened species may be present in the area affected by [NextEra's Soldier Creek Wind LLC] project and that implementation of such action [would] likely affect such species."  16 U.S.C. § 1536(a)(3); (3) the law creates a duty, particularly in the case of one of the top international and knowledgeable corporate actors building and operating huge wind towers, and planning this project for over two years, that are well known to kill and maim protected species of birds and bats.  Those billion-dollar resourced sophisticated actors, as the statute clearly infers, must apply "if" they have reason to believe protected species

are present; (4) NextEra absolutely had reason to believe those protected species are present, especially when a visit to the FWS website would immediately inform anyone of their presence; (5) they were obligated to submit an application for permit or license to the Department of Interior as a result; (6) since they have not applied, or have not yet obtained to Plaintiffs' understanding a permit, license, or exemption; (7) their failure to apply or seek a permit or license for the known takings hazard and nuisance they are creating has deprived Plaintiffs' of their statutory and due process rights to challenge any final decision on the matter.  Thus, NextEra should be enjoined from any further construction until that process of applying, thorough study, and final agency determination is completed.

58.   Pursuant to 16 U.S.C. § 1536(m), any final exemption decision that would normally have to be made by a Department of Interior interagency Committee established in statute, § 1536(g)-(h), is challengeable by a citizen suit that may proceed in district Court without having to first give 60-days prior notice to both the Secretary of Interior and the project sponsor.  Thus, the claim is timely.  NextEra has intentionally thwarted Plaintiffs' citizen suit right of action by failing to apply for an exemption from the ESA by obscuring the true nature of its obligation and the project in dealings with other federal agencies having a duty to consult with the Secretary of Interior prior to their "agency actions" that have facilitated NextEra's commencement of construction.  NextEra should not be allowed to frustrate and undermine the statutory regime meant to ensure the security of protected species.  Responsible federal agencies must be allowed to fully study and complete a statutorily adequate review process prior to NextEra putting everyone is an impossible position of making these decisions after hundreds of millions

of dollars of construction has already flooded over the damn leaving no adequate remedy to put the water back.  In the alternative, all federal agencies involved must withdraw all federal action already performed for the Soldier Creek project and not reissue until  the requisite consultation and studies has been fully completed.

59. For the foregoing reasons, Plaintiffs and the Putative Class have suffered harm by being deprived of the benefits and protections that federal law affords to them through NEPA and other laws that protect the human environment and surroundings of their community adversely impacted by Defendants' actions and/or omissions.

### The INDIAN RELIGIOUS FREEDOM ACT AND CHAPTER 5 OF TITLE 25 U.S.C. REQUIRES GOVERNMENT AGENCIES, PARTICULARLY THE DEPTARMENT OF JUSTICE, TO ACT TO PROTECT NATIVE AMERICAN TRIBES AND INDIAN RELIGIOUS FREEDOM RIGHTS FROM HARM CAUSED BY ANY FURTHE CONSTRUCTION OF SOLDIER CREEK PROJECT

60.  Plaintiff Mattwaoshshe has received no notice, consultation, nor warning of the imminent threat to his rights and interests that will be irreparably harmed by the massive Soldier Creek Wind LLC project only a few miles west of his residence on the Kickapoo Reservation and currently beginning construction in Nemaha County, Kansas.

61.  He only recently learned of the shocking size of each of the proposed NextEra wind towers.  He was also alarmed to learn of the huge number of 140 are in process of going up.  He was not previously made aware that these rotating wind towers pose a mortal threat to cherished wildlife in and around the Kickapoo Native lands and reservation.  He is particularly angry concerning these towers killing or harming Bald Eagles and Red-Tailed Hawks that hold special religious significance to the Kickapoo Tribe and represent particular importance to him personally.  These birds represent

cherished symbolic ancestral and heritage significance given his traditional given name. His last name, Mattwaoshshe (MAT-WA-O-SHEY-SHEY), has the rough English language translation of "Thunder Bird."

62.  Mr. Mattwaoshshe is deeply offended and angered by the sad repeat of a painful history of dismissiveness, neglect and lack of respect shown to his Kickapoo and Native people.  This is demonstrated by NextEra's disinterest in the sovereign rights and interests of Native Americans and their lands.  Plaintiff and his people will soon be faced with the humiliation of having to bear the ugly consequences of the presence of NextEra's monster structures without even the courtesy of legitimate consultation or compensation.  He also believes it is a betrayal for the United States Government not to have already interceded in the Courts to protect the rights and interests of his Native people and himself in the face of this looming invasion upon their lands.  He is especially concerned about the extremely bright strobe lighting that will flash bright throughout every night as if it is Times Square New York City rather than the calm and natural star-lit open plains his people have occupied before Kansas was even a State.

63.  These towers will cause irreparable harm to Mr. Mattwaoshshe's quiet enjoyment of his native land and residence.  The towers will interfere with wildlife sacred to Kickapoo heritage and religion.  His residence will be invaded by the massive, towering presence of these NextEra towers and should be permanently enjoined from any further construction.  The Department of Justice, pursuant to 25 U.S.C. § 174, 175, 185, should be ordered to step in to represent Mr. Mattwaoshshe and his Tribe to stop this invasion and harm upon their lands and people.

64.  25 U.S.C. § 185 states: "*Whenever any Indian, being a member of any band or tribe with whom the Government has or shall have entered into treaty stipulations,*

*being desirous to adopt the habits of civilized life, has had a portion of the lands belonging to his tribe allotted to him in severalty, in pursuance of such treaty stipulations, the agent and superintendent of such tribe shall take such measures, not inconsistent with law, as may be necessary to protect such Indian in the quiet enjoyment of the lands so allotted to him.*" (emphasis added).

25 U.S.C. § 174, "*The President is authorized to exercise general superintendence and care over any tribe or nation which was removed upon an exchange of territory under authority of the act of May 28, 1830...and to cause such tribe or nation to be protected, at their new residence, against all interruption or disturbance from any ... person or persons whatever.*" (emphasis added).

25 U.S.C. § 175 that: "*In all States and Territories where there are reservations or allotted Indians the United States attorney shall represent them in all suits at law and in equity.*"

65.  This is such an instance where the Government needs to step up and step in to save Plaintiff Mattwaoshshe and the Kickapoo Nation from imminent threat to their rights and interests; and save the United States from the shame of centuries of past neglect and abuse visited upon these native people.[24]

### CLASS ACTION ALLEGATIONS
### NEXTERA SHOULD BE ENJOINED FROM FURTHER CONSTRUCTION UNTIL THE ONGOING NUISANCE CLAIM IS FULLY ADJUDICATED TO PREVENT THEIR WIDESPREAD HARM BEING REPEATED IN THIS KANSAS PROJECT

66. Plaintiff hereby incorporates by reference all previous paragraphs and references made as if set forth herein.

---

[24] In another sad analogy with history, the Kickapoo Tribe has witnesses an outbreak of Covid-19 in recent weeks that has hampered, and will continue to hamper, Tribal leadership's response to the imminent threat posed by NextEra's project because of cancelled Tribal meetings because several in leadership themselves have contracted the disease. NextEra's flouting of Emergency Health Declarations and having continued with out of state contractors gathering by the 50-100 at its tiny trailer office due east of the Reservation is all the more offensive in this situation. NextEra continued full speed with construction during the "Stay Home" orders starting in March despite the fact they did not qualify as an "Essential Service" since they could not be considered to be currently "generating" electricity or engaged in its "transmission."

67. In Footnote 1, herein, Plaintiffs make reference to a closely related claim currently being litigated in Florida District Court, *Kohmetscher* Case 9:19-cv-80281-DMM.  Through that current claim, Defendants were put on notice of the devastating effects they will irreparably cause in the coming days if the rapid construction of the Soldier Creek towers is allowed to continue unabated.  It is clear that local residents within three miles of these wind towers -- keep in mind there are only 40 wind towers in the related Nebraska case as opposed to 3.5x more (140) about to be erected in this Kansas with closer spacing and 3x higher population density – will suffer serious damages to include harm to their health and well being and diminution and intrusion upon their property.

68. It is clear that if, as the law and facts compel, the Court finds Defendant NextEra liable in any way, either in later adjudication in this case or in the Florida *Kohmetscher* case, the damages will be permanent and involve harm to cherished homes that money cannot adequately compensate.  As such, NextEra cannot be given some sort of benefit of immunity or protected from the consequences of their irresponsible and premature construction efforts when they knew or should have known the harm to Plaintiffs and the Putative Class is, at a minimum, an open and ongoing question being adjudicated.

69. Therefore, it is imperative for the reasons described in the accompanying injunctive relief to issue an order, at least, on the grounds that their liability and the very irreparable damages realized by these imposing, mammoth structures would present irrevocable harm to the Plaintiffs and the Putative Class as it is almost impossible to imagine a Court or other competent authority ordering them to spend the billions needed

to then take them down after they are allowed to go up.  It is legitimate to ask, however, that in the case that any bond be necessary regarding injunctive relief under this specific cause of action, should not NextEra be the one compelled to put in escrow and agree unreservedly to liquidated damages in the billions of dollars for any cost necessary to reverse what they have wrought by tearing down and removing all traces of the mammoth towers and to compensate for damages should they lose the case?

70. Plaintiffs bring on their behalf and the Putative Class these class claims pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) as follows:

71. The Class: all persons in the United States who currently reside on and lease or own residential property within three miles of a NextEra wind turbine in the final planning and/or construction phase as well as on behalf of Mr. Mattwaoshshe and all those similarly situation to his particularly heightened sovereign status.

72. Expressly excluded from the Class and Subclass are any individuals who have a current and valid contractual relationship with Defendant NextEra or its subsidiaries for an unexpired contract, license, lease, or easement for the purpose of operating a wind turbine or "wind farm" on or adjacent to their property; any members of the judiciary or their staff assigned to preside over this matter; any officer, director, or employee of Defendant; and any immediate family members of such officers, directors, or employees.

73. The aspects of Numerosity (hundreds making joinder completely impracticable), Typicality (legal and fact basis for liability will be the same), Adequacy (the lead Plaintiffs and counsel will fairly and effectively represent the class), and Superiority (almost all members of the class would not be able to muster the resources to individually bring anything approaching this claim) are present similar to the companion

suit.

74. In terms of Commonality & Predominance, the questions of law and fact are overwhelmingly the same for the class and include some of the following serious issues:

(a) Whether the effects of Defendant's "wind farms," including disturbing and incessant noise, vibrations, shadow flicker and strobe lighting, which have caused nausea, headaches, sleep deprivation, vertigo, dizziness, anxiety, and diminution of property values, among other harms, are a private nuisance; whether Defendant's harmful acts were done knowingly and intentionally or done in contravention of a negligence standards of proof; and whether Plaintiffs and the Class are entitled to certain forms of relief.

**Private Nuisance (on behalf of Plaintiffs and the other Class members)**

75. Plaintiff hereby incorporates by reference all previous paragraphs and references made as if set forth herein.

76. Defendant NextEra's current and soon-to-be completed construction of the Soldier Creek Wind project presents an imminent, irrevocable private nuisance by the Project's components, equipment, movement, and effects on Plaintiffs and the Putative Class' person and property, due to the proximity to Plaintiffs and the Putative Class' properties.  They pose a material and unreasonable invasion of interests in the private use and enjoyment of Plaintiffs' and the Class' lands and substantively interfere with their homes and property interests.

77. The actions of Defendant NextEra and its subsidiaries certainly was done knowingly and intentionally and/or when they had a duty to avoid such harm and failed to abide by it.  They have been on notice of these matters set forth herein by the

accompanying suit in Florida, *Kohmetscher*.

78. Defendant NextEra's actions have caused actual physical discomfort to one of ordinary sensibilities with what they have done so far with the Project and with their contact in other locations following the same pattern once in the final planning and construction phases.   Their conduct in the final planning and construction phase, and soon post construction phase absent injunctive relief, has been performed in a way that is offensive and intolerable, and out of character for the normally quiet, residential and rural bedroom community nature of the areas where Plaintiffs' and the other putative Class members' properties are located.  Defendant NextEra and its subsidiaries know and understand the harms and negative effects that its turbines can have on nearby residents, and they nonetheless plan and construct their turbines too close to Plaintiffs' and the Putative Class members' homes and property with intent and reckless disregard.

79. As a direct and proximate result of Defendant NextEra's and its subsidiaries misconduct described herein, Plaintiffs and the Putative Class members have and will increasingly suffer monetary damages, pecuniary losses, other significant harms, including negative mental and physical health and well being affects, anxiety, emotional distress, serious disruption of their lives, and loss and undesired radical transformation of the use and enjoyment of their homes and properties.  Therefore, these quantifiable damages are subject to, and can be, proven at trial.

**Negligence (on behalf of Plaintiffs and the other Class members)**

80. Plaintiff hereby incorporates by reference all previous paragraphs and references made as if set forth herein.

81. Defendant NextEra and its subsidiaries assumed a duty of care owed to

Plaintiffs and the Putative Class when they undertook planning and construction of wind towers and/or "wind farms" too close in distance and manner from their homes, properties, work places, communities, and frequented locations.  Since they own, operate, and construct these so-called "wind farms," Defendant NextEra and its subsidiaries knew and/or could reasonably foresee their conduct in planning, construction, operating these "wind farms" would interfere with Plaintiffs' and the Putative Class' use and enjoyment of their homes, properties, work places, communities, and frequented locations.

82. Defendant NextEra and its subsidiaries were required to exercise reasonable care to (1) mitigate the strife, anxiety, disruption, and oppressive and/or intimidating conduct they caused during the planning and construction phases of the project; (2) also to mitigate the imminent noise, vibration, and other inner bodily disturbances to persons and property or wildlife made by its wind towers and other construction; and (3) site its towers far enough away from Plaintiffs' and the Putative Class' homes, properties, work places, communities, and frequented locations so as to not have negative effects on the health, well being, comfort, or peace of mind of effected persons and property.

83. Defendant NextEra and its subsidiaries breached its duty of care owed to Plaintiffs and the Putative Class as described herein.  As such they will have subjected Plaintiffs and the Putative Class and their guests and property to disturbances and violations of their rights through such things as strife, anxiety, a ascertainable and obvious break of community cohesiveness and trust, serious turmoil, and imminent subjection to a coming wind tower incessant noise, vibrations, shadow flicker and strobe lighting, which have caused nausea, headaches, sleep deprivation, vertigo, dizziness, anxiety, and diminution of property values, among other harms.

84. As a direct and proximate result of Defendant NextEra's and its subsidiaries misconduct described herein, Plaintiffs and the Putative Class members have and will increasingly suffer monetary damages, pecuniary losses, other significant harms, including negative mental and physical health and well being affects, anxiety, emotional distress, serious disruption of their lives, and loss of the use and enjoyment of their properties.  Therefore, these quantifiable damages are subject to, and can be, proven at trial.

WHEREFORE, for the foregoing reasons set forth herein, Plaintiffs for themselves and on behalf of the Putative Class respectfully pray for the following relief:

A.    Appropriate injunctive and equitable relief enjoining any further construction on the Soldier Creek Wind LLC project in Nemaha County, Kansas until all statutorily required circumstances as to NEPA, ESA, and other statutory air safety and nuisance questions are fully and adequately reviewed, studies, mitigated, and otherwise completely resolved, to include but not be limited to a full and open NEPA Environmental Impact Statement (EIS) and all requirements under the ESA as described herein;

B.    A Preliminary Injunction Ordering Defendant NextEra and its subsidiaries and affiliates to immediately halt all construction on the Soldier Creek Wind LLC project in Nemaha County, Kansas until an Final Order is entered on Plaintiffs claims herein;

C.    A Mandamus Order directing the U.S. Department of Justice to represent Mr. Mattwaoshshe in this action and other matters to enjoin NextEra from infringing upon his rights and interests and to protect and pursue his rights and interests herein, and that of his federally-recognized Kickapoo Tribe, in relation to the Soldier Creek Wind

LLC project.

D. An order certifying the proposed Class as defined above and appointing Plaintiffs as the Class representative and their Counsel as Class Counsel;

E. An award of actual, compensatory and punitive damages, costs and reasonable attorneys fees and such other relief the Court finds appropriate.

Dated: May 18, 2020                                   Respectfully submitted,

_____Unsigned_____

*Blair Drazic, Esq. (CO No.39879)*
*Grand Junction, Colorado*
*Counsel for Plaintiffs and the*
*Putative Class*
*\*Admitted in Fed. Dist. Ct. Dist. Of*
*Colorado*
*Pro Hac Vice Motion Filed*

_____s/James Renne/_____

*James Renne, Esq.(DCB No.460235)*
*4201 Wilson Blvd.*
*Suite 110521*
*Arlington, VA 22203*
*Counsel for Plaintiffs and the*
*Putative Class*